[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff in this case, Construction Coordinators Unlimited, P.C., ("Construction Coordinators") brought suit in this matter in March, 1990. In essence, the complaint alleged CT Page 8642 that Joseph Schipani, president of Construction Coordinators, had been hired by defendants in May, 1987, had been wrongly terminated, thus sustaining damages.
Trial was held in December, 1993 and January, 1994, followed by written submissions from plaintiff and the two appearing defendants, Dr. David P. Schwaber and Robert Crochetiere.
For the reasons stated below, having reviewed notes of the trial testimony, the transcript of the testimony, having reviewed the pleadings, and the submissions of counsel, the court finds that judgment should presently enter in favor of plaintiff against the defendants except for defendants Cmiel and Cohn in the amount of $13,300 plus interest from June to October 8, 1989, to the present. On receipt of further information which the court is ordering to be provided as indicated below, the court will decide whether judgment should also enter against defendants Cmiel and Cohn.
Facts
The court will not attempt to set out in detail all of the evidence offered at the trial. Generally speaking, the court endorses and approves the statement of facts as set out on by plaintiff on pages 1 through 19 in its April 19, 1994, brief. In summary, the facts required to understand this ruling are as follows.
Joseph Schipani was at all relevant times the president of Construction Coordinators, a Connecticut corporation engaged in the business of construction management. In May, 1987, defendant Richard Cmiel was a partner with defendant Dr. David Schwaber in a development company known as Stonefield Associates, also referred to in this opinion as Stonefield Associates I. Stonefield Associates I sought plaintiff's services as construction manager at a planned Burlington, Connecticut development construction project (the Burlington project). Schipani proposed that plaintiff would involve itself in construction management and land planning at the Burlington Project. A letter of agreement dated May 22, 1987, memorializes Schipani's proposal. Plaintiff's Exhibit A.
A team comprised of an architect, attorneys, professional engineers, a soil scientist, a traffic specialist, construction CT Page 8643 managers, and land planners worked together on the project. Along with others on the team, Schipani worked to gain certain approvals from the Town of Burlington in connection with the project. Schipani wasn't asked to give, nor did he give, a guarantee that the approvals would be obtained and that the project would be built.
The May 22, 1987, proposal was superseded by formal written contracts. On January 21, 1988, defendants Cmiel and Schwaber, doing business as Stonefield Associates, executed separate written contracts for both the Hogan's View and Thompson's Farm projects. Significant provisions of the contracts, Plaintiff's Exhibits B and C, are set out in detail in plaintiff's April 19, 1994, brief, and will not be recited here. The provisions set out, among other things, the basis upon which plaintiff was to be compensated, and provisions relating to termination of the agreement. The contracts provided no basis for the payment of legal fees or costs in the event of breach. The contracts were American Institute of Architects standard form agreements.
On or about June 14, 1988, defendants Cmiel and Schwaber, doing business as Stonefield Associates, were joined by two additional partners, defendant Alan Cohn and defendant Robert Crochetiere, who had previously done business as Cohn/Crochetiere Development Limited Partnership. Thereafter, Stonefield Associates was known as Stonefield Associates II; the original partnership of defendants Cmiel and Schwaber was referred to as Stonefield Associates I. (Plaintiff's counsel has informed the court in his brief that defendant Cmiel, who was not present at trial, filed for a stay of this action pursuant to Practice Book § 250A, although that is not reflected in the court's file. Plaintiff's counsel has also represented that defendant Cohn, also not present at trial, has filed for bankruptcy, which the court file confirms. However, the court file does not indicate that a stay of this action was sought by Cohn.)
The partnership agreement reached in June, 1988, is entitled "Stonefield Associates II Partnership Agreement." It was signed by Cmiel and Schwaber for Stonefield Associates, and defendant Cohn, identified as the president of Cohn/Crochetiere Development Limited Partnership. Neither at trial, where he chose not to testify, nor in the pleadings, did defendant Crochetiere argue that he was not subject to the June 14, 1988, CT Page 8644 partnership agreement. It was entered into evidence as Defendant's Exhibit 4. No evidence was presented at trial that Schipani knew of the agreement or its contents.
A number of the required permits were in fact obtained for the Burlington Project, while Schipani was working for the project. At the suggestion of legal counsel, defendants withdrew their application, then pending before the town's Planning and Zoning Commission, in August, 1988, fearing denial due to problems with the design of the proposed septic system. Schipani was not responsible for the septic system design.
A period of negotiations followed between Schipani and defendants. Defendants demanded proposed revisions in the contract that had been reached and, without previously informing Schipani, hired Land Engineering Services, Inc., to replace Schipani. Plaintiff unsuccessfully sought to maintain his role in the project, making various proposals to defendants. Plaintiff was never formally terminated in writing.
Necessary permits were ultimately obtained for a phase of Thompson's Farm and the Burlington Project, but the Burlington Project was not built, largely because in defendant Schwaber's view, it was not economically feasible to proceed. Dr. Schwaber testified that one reason plaintiff was not paid all amounts owed was because the Burlington Project was not built. Schwaber could not identify any provision in any contract that required that the Burlington Project to be built as a condition of plaintiff's compensation.
Following plaintiff's termination, defendants failed to pay an invoice for approximately $6,600 relating to construction management services. On May 5, 1989, plaintiff recorded a mechanic's lien dated May 4, 1989, against the Burlington Project of Stonefield Associates II in the amount of $56,700. Schipani's testimony was that approximately $6,700 related to the unpaid August, 1988 invoice for services rendered; whereas the other $50,000 was a proposed buy out figure for plaintiff's then estimated losses relating to land planning and services rendered. Schipani arrived at the $50,000 number after consulting two people as to its propriety.
On June 8, 1989, following demand by plaintiff that defendants pay the outstanding invoice and clarify Schipani's role, direct settlement negotiations were undertaken between CT Page 8645 Schipani and defendants Cmiel and Schwaber. The result was a document entitled "Agreement," Plaintiff's Exhibit G. The agreement was drafted by Schipani, and signed by Cmiel and Schwaber. The agreement states that "This agreement is betweenStonefield Associates I II and Construction Coordinator Unlimited,Inc. made on June 8, 1989." The agreement states that Stonefield Associates will pay the total sum of $20,000 to Construction Coordinators Unlimited, Inc. — $6,700 on or before 6/13/89, with the mechanic's lien to be released upon the payment being made; and $13,300 to be paid on or before 10/8/89. The agreement states that "Upon receipt of $20,000 total, the parties have no further obligations amongst each other and the agreement is terminated." The agreement further provided that Construction Coordinators would release to Stonefield Associates all related drawings, bids, etc. on receipt of first payment.
The first payment of $6,700 was made in June, 1989 in two separate checks, one from Schwaber and one from Cmiel. In reliance on the June 8 agreement and the representations of Cmiel and Schwaber, and in anticipation of receiving the second payment of $13,300, Schipani released the mechanic's lien and provided Stonefield Associates II with the requested drawings, documents and bids relating to the Burlington Project. Plaintiff never received the second payment despite promises by defendants and repeated demands.
Defendant Crochetiere did not testify at trial at all.
Defendant Schwaber, defendant's only witness at trial, testified that defendants never intended to make the second payment of $13,300 at the time the agreement was negotiated and the June 8, 1989 agreement was executed. Schwaber testified that the agreement was signed to obtain release of the mechanic's lien and to get the necessary documents back from Schipani. Schwaber indicated that he felt that the mechanic's lien was excessive, and that he executed the agreement under duress and coercion, for fear of losing the Burlington Project. Schwaber testified that he knew that defendants' partnership agreement required three partners' signatures to be binding on all four partners. Schwaber testified that the partners did not want to incur additional legal fees by seeking to have the mechanic's lien removed through normal legal processes. Cmiel and Schwaber voluntarily made the initial payment under the agreement. There is no evidence that at any time prior to trial Crochetiere did anything to disavow the CT Page 8646 agreement. There is no indication that Schipani in any way threatened or intimidated Cmiel or Schwaber into signing the agreement.
Legal Analysis
The court has considered plaintiff's claim that he is entitled to damages of $297,221.35, plus interest, for both preconstruction phase construction management services and land planning services rendered by plaintiff to defendant. The court rejects these claims for two reasons. First, because, given all the facts and circumstances present in this case, including the fact that the projects were not completed and much anticipated work was not performed by plaintiff, and the claim of commercial impracticability put forth by defendants, the damages claimed are speculative and based on conjecture. As such, there is not an adequate basis to establish damages with sufficient specificity. Lewis v. Hartford Dredging Co.,68 Conn. 221, 236. (1896). While the failure of the projects to be built can in no way be attributed to plaintiff, the contracts were entered into in anticipation of the projects being completed. Cf., O'Hara v. State, 218 Conn. 628, 637 (1991).
Second, and more significantly, the court's view is that any prior agreements or amounts owed were superseded and replaced by the June 8, 1989, agreement between Stonefield Associates I and II, signed by Schwaber and Cmiel. In the court's view, the June 8, 1989, agreement was in the nature of either an accord and satisfaction, or a novation, depending on how it is viewed. See Corbin on Contracts, (1962 ed.), Chapter 71, "Substituted Contract-Novation." See also Calamari and Perillo, Contracts, Chapter 21, "Discharge of Contracts."[1]
Preliminarily, the court rejects Schwaber's contention that the June 8, 1989, agreement was the product of duress, coercion or undue pressure. No evidence whatever in the record supports this claim. The fact that Schipani was using legal process — the filing of a mechanic's lien — to enhance his bargaining position does not render his conduct improper or coercive in any way. This is not uncommon. To the contrary, the evidence indicates that Schwaber, and Cmiel, made a business decision to attempt to resolve all outstanding disputes with Schipani given the disagreements that had arisen. McCarthy v. Taniska,84 Conn. 377, 381-82 (1911).
Nor does the court conclude, in spite of Schwaber's CT Page 8647 testimony that he never intended to comply with the June 8, 1989, agreement, that the agreement was procured by fraud or is rendered null and ineffective. In the court's view, at the time the agreement was entered into — irrespective of what was or was not inside of Schwaber's mind — the agreement had all the necessary requisites required to make it effective. It represented a bargained-for accommodation between the parties in an attempt to resolve outstanding disputes. At the time it was signed, it represented a meeting of the minds. Its terms were clear and definite. It was a contract between the parties to put an ongoing dispute behind them. By its very terms, it was between Stonefield Associates I and II, and Construction Coordinators.
Schwaber's trial testimony that he never intended to fulfill the agreement, given more than four years after signing it, and in light of changing financial conditions and circumstances, in any event, is somewhat self-serving and the court does not credit it wholly. The first payment contemplated under the agreement was in fact made. In the context of the trial, Schwaber has an interest in presenting his previous intentions in such a light not only to advance his own claims but also to protect the interests of his partners seeking to avoid the consequences of the agreement. There was no testimony during trial that, at the time the agreement was entered into, Schwaber or Cmiel or anyone indicated or suggested that it was being coerced or was not being entered into in good faith. In fact, Schwaber indicated that he entered into the agreement as a way of attempting to resolve the dispute without the need to incur attorney's fees. Viewing the case in its totality, the court sees no reasons to doubt the vitality and validity of the June 8, 1989, agreement, notwithstanding the caveats, qualms and concerns stated by Schwaber at trial.[2]
If the agreement was effective, the question becomes who it was effective against. Defendant Crochetiere — who, as noted, appeared but did not testify — apparently takes the position that he should not be bound by the June 8 agreement first, because he was not aware of the agreement until later; and second, because, under the terms of the partnership agreement, more than two signatures were required to bind all partners to such an agreement.
With respect to the first argument, as noted at 59A Am.Jur.2d, "Partnership," Section 259, ". . . whether a partner CT Page 8648 is aware that his copartner is acting to incur obligations on behalf of the partnership has no effect on the actor's authority to do so." Moreover, General Statutes §§ 34-47 and 53 are relevant.
Section 34-47 states:
 (1) Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.
There is no evidence in the record that Schipani doubted, or had reason to doubt, the authority of Schwaber and Cmiel to act for their partners.
Section 34-53 provides in relevant part that "All partners are liable . . . jointly for all . . . debts and obligations of the partnership. "
See also General Statutes §§ 34-49, 50, 54 and 55.
Under the statutes, then, viewing all of the evidence, all of the partners of Stonefield I and II were, in the court's view, bound by the June 8, 1989, agreement, jointly and severally, pursuant to Connecticut law.
The court rejects the argument that Cmiel and Schwaber could not bind the other partners as a consequence of certain provisions contained in the June 14, 1988, partnership agreement, Defendant's Exhibit 4. These provisions govern the relationships between and among partners. Under the circumstances of this case — where there is no evidence that Schipani had any knowledge of the partnership agreement's provisions — such provisions do not act to limit plaintiff's rights and remedies in light of the general provisions of law cited above, which take precedence over the provisions of the partnership agreement. See 59A Am.Jur.2d, "Partnership", CT Page 8649 §§ 266-284.
The court also takes note of the fact that defendants asserted in their disclosures of defense filed in this case, see, e.g., Disclosure of Defense of Robert Crochetiere, dated May 11, 1990, that they were not obliged to pay greater amounts of damages pursuant to previous agreements because of the June 8, 1989, agreement. Defendant Crochetiere alleges in paragraph 2 of his Disclosure of Defense that: "The plaintiff has settled with the defendant all disputes arising out of this employment arrangement pursuant to an agreement dated June 8, 1989. . ." This disclosure, never withdrawn, is at odds with the position asserted by Crochetiere at trial.
Summary and Conclusion
For the reasons stated above, it is the court's conclusion that judgment should enter in favor of plaintiff, as against all defendants other than defendant Cmiel and Cohn[3] in an amount of $13,300, plus interest from the date of 10/8/89 to the present. Attorney's fees and costs are denied as not warranted in this case. In the court's view, the most equitable result is for defendants to complete the agreements agreed upon pursuant to the June 8, 1989, agreement, plus interest. In the event that the court concludes, on receipt of an additional written submission from plaintiff, and defendants Cmiel and Cohn, that the judgment should be amended to include Cmiel and Cohn, it will do so.
DOUGLAS S. LAVINE JUDGE, SUPERIOR COURT